UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038-4502
(212) 545-4000
    Marjorie Kaye, Jr. (MK 7141)
    Jason A. Zoldessy (JZ 6522)

ATTORNEYS FOR DEFENDANTS

| | |
|---|---|
| JEREMY V. LEWIS,<br><br>                         Plaintiff,<br><br>                -v.-<br><br>TWO'S COMPANY, GESS RYAN<br>AND MARY JANE NAGEL,<br><br>                         Defendants. | Civil Action No. 06 Civ. 4775 (CM)<br><br>**DEFENDANTS' RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' SUMMARY JUDGMENT MOTION** |

       Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of this Court, Defendants Two's Company, Gess Ryan and Mary Jane Nagel (collectively "Defendants") respectfully submit this Statement of Uncontested Material Facts in Support of Defendants' Motion for Summary Judgment.

## INTRODUCTION

       In this action, Plaintiff Jeremy V. Lewis (referred to herein as "Plaintiff") alleges violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"). Plaintiff alleges that he was subjected to a hostile work environment as a result of racial comments made by co-workers Manny Diaz and Nadira Sewnarine over the course of his employment. Plaintiff alleges that he complained to various management personnel over the course of his employment about

the comments, but that nothing was done to address his complaints. Plaintiff further alleges that he was selected for layoff in a Reduction in Force in August 2005 in retaliation for his complaints about alleged racially derogatory comments by his co-workers. Plaintiff alleges Mary Jane Nagel, Vice President of Operations of Two's Company, and Gess Ryan, the Warehouse Manager, each aided and abetted the promulgation of a hostile work environment and are liable individually for their alleged conduct under the NYSHRL. Plaintiff has voluntarily withdrawn his claims under the Americans With Disabilities Act and has also withdrawn individual claims against Ms. Nagel and Mr. Ryan under Title VII.

## TWO'S COMPANY BACKGROUND

1.  Two's Company is a privately owned family business, founded in 1968 by the late husband of the current Chief Executive Officer and owner, Roberta Gottlieb, and is a distributor of home accessory and gift products to retail establishments. (Exhibit A, Employee Handbook and Plaintiff's Receipt for Same, Bates D0001-D0020, D0027; Matlick, 8; Nagel, 15)[1]

2.  Until June 2005, Two's Company was located entirely at 30 Warren Place, Mount Vernon, New York. In or about June 2005, the warehouse moved to 500 Saw Mill River Road, Elmsford, New York. In December 2005 and January 2006, the offices followed, making the relocation to Elmsford complete in January 2006. (Nagel, 111-112; Ryan, 22)

3.  As of August, 2005, the Company employed approximately 119 employees in the office and warehouse. Of those employees, 28 were Caucasian, 44 were Black, 21 were Hispanic and 26 were West Indian. (Exhibit B, Bates D0222-D0226, January 27, 2006 Affidavit of Jeannette Cruz, ¶34)

---

[1] References to the deposition transcripts of various witnesses are designated by the last name of the witness, followed by the transcript page(s). Relevant pages of the deposition transcripts are attached to the Affidavit of Marjorie Kaye, Jr. and designated by the witnesses' names.

2

## RELEVANT COMPANY PERSONNEL

4. Harvey Matlick is Vice President of Finance and Chief Financial Officer of Two's Company, for 22 years. (Matlick, 8)

5. Jeannette Cruz, the Human Resources Manager, reports directly to Larry Gray, the Comptroller and indirectly to Harvey Matlick. Employees with complaints are aware they can go to any manager or owner of Two's Company. (Exhibit A, Bates D0020; Cruz, 11, 67-68; Matlick 17-18)

6. Mary Jane Nagel is Vice President of Operations. (Nagel, 5-6)

7. Gerald "Gess" Ryan is the Warehouse Manager, reports to Ms. Nagel, and supervises the warehouse employees, including Plaintiff. (Ryan, 6, 14)

8. Nadira Sewnarine is a metering clerk in the warehouse and is of Guyanese descent. (Sewnarine, 6, 14)

9. Jacques St. Juste is a former employee who worked next to Plaintiff and is of Haitian descent and Black. (St. Juste, 5; Pl. Dep., 38)

10. Edward Davis is a forklift driver and is Jamaican and Black. (Davis, 9, 15)

11. Richard Gowkarran is a maintenance worker and is Guyanese. (Gowkarran, 7, 17)

12. Dean Richards works in the warehouse as an inventory clerk, who is Jamaican and Black. (Richards, 8-9, 48)

13. Manny Diaz is a former maintenance worker and driver for Two's Company who is Hispanic. (Cruz, 136)

14. Plaintiff Jeremy Lewis was hired by Mary Jane Nagel and Gess Ryan on February 12, 2001 to work in the warehouse. He is Jamaican and Black. (Pl. Dep., 9, 28-29)

3

15. Complainant's last position prior to his termination on August 25, 2005 was as a warehouse clerk with responsibility to tape boxes for shipping out to the Company's customers. (Nagel, 23)

## AUGUST 2005 REDUCTION IN FORCE

### Discussions Leading to the 2005 RIF

16  In or about August 2005, Two's Company experienced its first Reduction In Force ("RIF") (Matlick, 27-28)

17  Mr Matlick reviews every expense in the Company  He was also aware of market forces causing a downward spiral in business dramatically reducing sales orders, including the influence of "Big Box Retailers" such as Walmart and Target and the internet. Sometime prior to June 2005, Mr Matlick and Mary Jane Nagel discussed steps to take to cut back expenses, including tasks that could be reduced.  At that time, they did not discuss eliminating specific employees (Matlick, 10-11, 30-32, 36-37; Nagel, 72-73, 81-83; Cruz, 22-23)

18  Plaintiff has no knowledge of Two's Company's financial situation  (Pl Dep. 173)

19. Ms Cruz was informed of the pending RIF sometime at the end of July, 2005. (Cruz, 17, 23-24)

20. At Mr. Matlick's request, Ms. Nagel reviewed every aspect of Operations from use of supplies, purchasing cartons, payroll, use of temporary agency help, the number of calls into and placed by customer care, number of cartons shipped and the relationship between warehouse costs to percentage of sales. (Nagel, 74-77, 90-92)

4

21. Many conversations took place among Mr. Matlick, Ms. Nagel, Mr. Ryan, Ms Cruz and others in an attempt to reduce expenses without disrupting business. Eventually, discussions focused on laying off workers. However a decision was made not to reduce sales people, showroom managers or employees in the design or creative department (Matlick, 37-38, 63, 66; Nagel, 82-83)

22. Harvey Matlick selected employees in the Finance Department for layoff, and Mary Jane Nagel selected employees working in the warehouse or who supported the warehouse in the office. (Matlick, 44; Nagel, 79, 85)

23. In or about June, 2005, Gess Ryan and Ms. Nagel discussed the slowdown of work and various positions that could be eliminated or combined with other positions in the new warehouse (Nagel, 84-85; Ryan, 20-21, 25-27, 29)

24. Mr. Ryan examined the workload volume and advised Ms. Nagel that the Company could make cuts in the picking line, replenishment, packaging, metering and among the general warehouse personnel. (Ryan, 30-31, 38-39, 45-47)

**Discussions Specific to Combining Taping and Dunnage Functions**

25. Sometime prior to discussions about the RIF and after the warehouse moved to Elmsford, Tom Gottlieb made observations to Ms. Nagel and Mr Ryan that the dunnage function (adding paper filler to boxes) and the taping function could be combined. (Ryan, 53,55, 61-65)

26. Plaintiff performed the taping function, pushing boxes through the taping machine and then further along the conveyor belt to load onto trucks. Ricoh Ducasse, who is also Black, performed the dunnage function. Mr. Ducasse had less seniority than Plaintiff. (Pl Dep., 35-36; Matlick, 61-62; Ryan, 47, 83)

5

## Process to Select Individual Employees for the RIF

### Performance

27. When Ms. Nagel observed Plaintiff's working habits, it was not uncommon for her to look across the mezzanine and see Plaintiff leaning against the tape machine waiting for the next carton to come along. (Nagel, 129-130)

28. Plaintiff was observed to do his job adequately when there were boxes to move through the tape machine, but if he had no work in front of him, he did not take the initiative to find something else to occupy his time, which was noted year to year in his performance evaluations. (Nagel, 136-138, 143; Exhibit C, Plaintiff's Performance Evaluations, Bates D0031-D0040)

29. Mr. Ducasse, was always busy working. "If he doesn't have cartons coming down for dunnage, you might find him picking up debris from the floor, walking down to key accounts to see if he can do something there. I have never, one time, seen him standing and not working." (Nagel, 130)

### Seniority

30. To evaluate who would be laid off, seniority was considered, but the overriding factor was efficiency and performance of the employees. (Nagel, 90)

### Individuals Selected for Lay Off

31. Mr. Ryan discussed specific positions and then specific employees as possible candidates for the RIF with Ms. Nagel. (Ryan, 56-58)

32. Eventually, sometime in August 2005, ten employees were selected for layoff, including five (5) warehouse workers, three (3) customer care employees and (2) Finance Department employees. (Nagel, 85-88)

6

33. The decision was made to terminate Plaintiff, along with Dolores Padilla, Jennifer Rivas, Paulette Campbell, Jeremy Lewis, Junior Pitt, Jimmy Perez, Bernadette Sanichar and Melissa Deleon. (Cruz, 35-36)

34. Harvey Matlick made the decision to terminate Patricia Dimaggio and Faina Auerbach. (Matlick, 44)

35. Of the ten employees who were terminated, three (3) were White, four (4) were Black and three (3) were Hispanic. Plaintiff's tenure of 4 ½ years with Two's Company, was the same or less than four other employees selected for layoff. (Exhibit B, Cruz Affidavit, ¶35; Exhibit Q, Bates D0186)

36. A document was read to each employee who was laid off, including information about severance, whether their position was to be eliminated or restructured, and encouraging them to seek counsel prior to signing a release. (Cruz 41; Exhibit D, Bates D1261-D1271)

## Termination Meetings August 25, 2005

37. The terminations were carried out on August 25, 2005 in Mt. Vernon (the office) and in Elmsford (the warehouse). (Cruz, 38)

38. Mary Jane Nagel terminated Jennifer Rivas, Paulette Campbell, Dorlores Padilla, Bernadette Sanichar, Jeremy Lewis, Jimmy Perez and Junior Pitt. (Nagel, 99, 109)

39. Ms. Cruz was present for the terminations of Plaintiff, Junior Pitt, Bernadette Sanichar, Jennifer Rivas, Paulette Campbell, Delores Padilla, Melissa DeLeon, and Jimmy Perez. (Cruz, 37)

40. Mr. Ryan escorted Plaintiff and the other employees to and from the meetings. (Ryan, 65-66; Cruz, 55)

41. Ms. Nagel met with Plaintiff with Jeannette Cruz, telling him his job was being restructured and that Two's Company did not have a severance policy, so to be paid severance, he would be required to sign a release. She told him the amount of severance being offered, how the payment would be made and the time frame to return the release and to consult an attorney prior to returning the release. Ms. Nagel emphasized that the release had a confidentiality provision in it. (Nagel, 99-101; Cruz, 55-56, 58; Exhibit D, Bates D1261-D1262)

42. On the way out of the meeting, Plaintiff made a remark to Ms. Nagel, "I'll see you, Mary Jane." Ms. Nagel and Ms. Cruz interpreted the remark as a threat, but did not act on it. (Nagel, 101-103; Cruz, 59-60; Exhibit D, Bates D1261-D1262)

43. Mr. Ryan escorted Plaintiff from his meeting with Ms. Nagel, and while they were walking Plaintiff told him that Mary Jane Nagel was a racist. (Ryan, 67)

**Taping and Dunnage Were Combined After the RIF**

44. After his termination, Plaintiff's duties at the taping machine were performed by Ricoh Ducasse, who is Black, along with Mr. Ducasse's other function to run the dunnage machine. (Ryan, 50)

**Temporary Employees**

45. Temporary workers have helped with the taping function as necessary before and since Plaintiff was terminated. (Ryan, 50, 137-138; Richards, 19-20)

46. Temporary employees continued to be employed by Two's Company during and following the layoff in August 2005. There are almost always temporary workers in the warehouse. Reasons for retaining temporary employees included:

a. That they were less costly than permanent employees;

8

    b      They performed work that was temporary in nature, causing the temporary employee's work to end;

    c      Two's Company's move from Mt. Vernon to Elmsford was done by the Company and not a moving company, therefore it required temporary heavy labor;

    d.     As Two's Company was moving its facilities from Mt. Vernon to Elmsford from June to December 2005, two warehouse sales were conducted to benefit charities, requiring additional labor;

    e      The entire Tozai Department, located on the 2nd floor of the Mt. Vernon building had to be relocated, because the lease expired;

    f.      A great deal of stock was maintained in the lower warehouse;

    g.     The Mt. Vernon facility had to be cleaned, thus requiring temporary workers. (Matlick, 81-84; Nagel, 94-96, 111-114; Cruz, 15-17)

## PLAINTIFF'S ALLEGATIONS REGARDING HOSTILE WORK ENVIRONMENT

### Plaintiff's Background at Two's Company

47    Plaintiff's work at Two's Company commenced in 2000, initially working through Manpower Employment Agency. He was made a regular employee of Two's Company on February 12, 2001. (Pl. Dep., 29)

48.    Plaintiff did not request and does not receive Company sponsored health insurance (Pl Dep., 30-31)

49.    Plaintiff exchanged daily greetings with Mary Jane Nagel and otherwise spoke with Ms. Nagel from time to time during the workday, having a cordial relationship with her (Nagel, 66; Pl Dep., 82, 85).

50. On two occasions, Plaintiff visited Ms. Nagel in her office, once to tell her he thought she should be in the warehouse more often because people worked harder when she was around and a second time to show her a newspaper clipping related to his work making things from others' discarded items. (Nagel, 68-69)

51. When Plaintiff had a display of his crafts at a local library, Roberta Gottlieb, the owner of Two's Company, went to see it. (Pl Dep., 84)

### Plaintiff's Relationship with Jacques St. Juste

52. Plaintiff had daily contact with Jacques St Juste, a former employee, from the first day he began working at Two's Company and the two men became friends, taking lunch and breaks together on a regular basis. (Pl. Dep., 33-34)

53. The packages that Plaintiff tapes travel on a conveyor belt, going first to the metering clerks and then to dunnage where they are filled with paper and then to Plaintiff to be taped. (Pl Dep., 35, 38-39)

54. When the line slowed down, Plaintiff was expected to do something else, for example, to work in replenishment until needed again at the taping machine. (Pl Dep., 37-38)

### Nadira Sewnarine, Metering Clerk

55. Nadira Sewnarine is a native of Guyana, South America and has been in the United States since 1989. (Sewnarine, 6-7)

56. Ms. Sewnarine has been employed by Two's Company for nine years, starting on the pick line taking merchandise from shelves according to order slips and packing it into boxes. (Sewnarine, 7, 11)

10

57   Ms Sewnarine was promoted to work at one of the postage meters in the warehouse, a post immediately before Plaintiff's station at the taping machine. She weighs boxes and affixes postage. (Sewnarine, 14, 50-52)

58   At all relevant times there were at least two and sometimes three metering clerks, Nadira Sewnarine, Kim Johnson and Joyce Morton. Ms Johnson and Ms Morton are Black. (Pl Dep., 44-45)

59   Ms. Sewnarine had no authority over the terms and conditions of Plaintiff's employment. (Pl. Dep., 40)

60.   Ms Sewnarine asked Plaintiff to lift boxes for her. (Pl. Dep., 40-41)

61   There is a telephone that the Company installed next to Ms. Sewnarine's work station for her use. (Sewnarine, 56-58; Ryan 117-118)

62.   Ms. Sewnarine has received consistently excellent performance reviews (Exhibit E, Bates D0114-D0133)

### Nadira Sewnarine's Avon Business

63   Ms. Sewnarine sells Avon to her co-workers, including to Jeannette Cruz, HR Manager, with the knowledge and permission of Two's Company management. (Sewnarine, 18, 28, 63; Cruz, 95; Exhibit R)

64   Ms. Sewnarine passes a catalogue among her co-workers who select the Avon products they wish to buy and the catalogue, the products and payments for the products are ferried between the office and warehouse by a co-worker or distributed by Ms. Sewnarine in the lunchroom during the lunch break. (Sewnarine, 63-64)

11

### Complaints about and by Ms. Sewnarine

65. Plaintiff complained about Nadira Sewnarine to Mr. Ryan perhaps thirty (30) times and Ms. Sewnarine similarly complained about Plaintiff to Mr. Ryan (Ryan, 113-114)

66. Plaintiff complained that Ms. Sewnarine sent him too much work and that she used the telephone for personal calls (Ryan, 113-117)

67. On at least one occasion, Plaintiff shouted at Ms. Sewnarine, making her cry (Sewnarine, 37-38, 48-49, 53; St. Juste, 90-93)

68. Ms. Cruz was called to intervene between Plaintiff and Ms. Sewnarine after the two were shouting at each other because a box became stuck on a conveyor belt and neither employee would move it (Cruz, 91-100)

69. Plaintiff told Ms. Cruz that Ms. Sewnarine was always "against" him because he is Jamaican (Cruz, 97-98)

70. Ms. Cruz spoke with Ms. Sewnarine, conveyed Plaintiff's concern and comment, and Ms. Sewnarine assured her that nationality had nothing to do with their argument. (Cruz, 98)

71. Ms. Cruz related the information to Plaintiff, believed the matter to be settled to the satisfaction of both employees and recalled no other problems arising between them (Cruz, 99-100)

### Two's Company's Records Reflect No Complaints of Race Discrimination Regarding Nadira Sewnarine

72. Mr. Ryan has no record or recollection that Plaintiff complained to him that Ms. Sewnarine referred to him as "boy" or as "murderer" or "thief" or that she is a racist. (Ryan, 107, 111)

73. Ms. Nagel has no record or recollection of any complaint by Plaintiff about Ms. Sewnarine in any respect. (Nagel, 59)

74. Ms Cruz has no record or recollection of Plaintiff complaining that Nadira did not like him because he was Jamaican or Black, other than the incident that involved moving the box on the conveyor belt (Cruz, 97, 100-101)

75. Ms. Cruz received no other complaints about Nadira from Plaintiff or any other employee at Two's Company (Cruz, 101)

76. Plaintiff complained to Mr Ryan from time to time that Kim Johnson, a metering clerk with Two's Company, had opened a meter and was sending him too much work. (Ryan, 141)

77 Mr Ryan has no record or recollection that anyone expressed concern that Guyanese employees at Two's Company as a group did not like Blacks. (Ryan 110)

### Plaintiff's Co-Workers Testimony Regarding Nadira Sewnarine

78. Edward "Eddie" Davis, a warehouse worker who is Black and Jamaican, and noticed for deposition by Plaintiff to testify, stated that Plaintiff complained to him about Ms. Sewnarine making too much work for him and that the work hurt his shoulder, but Plaintiff never told him she had used the word "boy" to address him (Davis, 45-46)

79 Dean Richards, who is Black and Jamaican, was noticed for deposition by Plaintiff, stated that he had not heard Ms. Sewnarine call Plaintiff "boy."(Richards, 54)

80. Neither Dean Richards nor Eddie Davis heard any Guyanese refer to Black people as murderers and thieves. (Richards, 48; Davis, 48)

81. St. Juste heard Plaintiff tell Sewnarine to stop calling him "boy" and after that she called Plaintiff "boy" "once in a blue" and never again called St. Juste "boy." (St. Juste, 21-22)

**Manny Diaz – Former Maintenance Man and Driver**

82. Manny Diaz, who is Hispanic, was a maintenance worker and driver for Two's Company, employed from February 12, 2001 to March 1, 2005. (Nagel, 26; Exhibit F, Bates D0070, D0084)

83. Mr. Ryan and Mr. Diaz have not spoken since Mr. Diaz was terminated. (Ryan, 85-86)

84. Sometime in or about September 2004, Mr. Diaz painted some rooms in Mary Jane Nagel's house, for which he was compensated. (Nagel, 47; Ryan, 98)

85. Mr. Diaz was known to be loud and make jokes in the warehouse. Plaintiff complained to Mr. Ryan that Mr. Diaz was boisterous when he would work on the line. Mr. Ryan described Mr. Diaz as annoying and acknowledged that Plaintiff did not like Mr. Diaz. (Ryan, 87, 89-90; Nagel, 56)

86. Ms. Nagel broke up two shouting altercations between Manny Diaz and Plaintiff on the warehouse floor, but otherwise did not take any disciplinary action regarding either employee. (Nagel, 125-127)

**Allegation by Dennis Achaibar that Diaz Referred to Achaibar as "Taliban"**

87. "Dennis" Roopram Achaibar, a warehouse worker, complained to Gess Ryan that Mr. Diaz referred to him as "Taliban." (Ryan, 87, 102-103; Cruz, 74-76)

88. After Diaz told Ryan he had called Achaibar "Taliban," on February 18, 2004, Mr. Diaz received a written reprimand for his behavior and was told by Gess Ryan and

14

Jeannette Cruz to apologize for his conduct (Ryan, 104-105; Cruz, 74-76; Exhibit G, Bates D0085)

89. Plaintiff was not aware Mr. Diaz received a written reprimand for his use of the word "Taliban" in the workplace (Pl. Dep., 200)

## Manny Diaz' Termination

90. Richard Gowkarran, a maintenance worker at Two's Company, was asked to keep people out of the parking lot on March 1, 2005 while a snow plow cleared it. Mr. Diaz got into an argument with Mr. Gowkarran who would not let Diaz into the lot. During the course of the argument, Mr. Diaz reached into Mr. Gowkarran's car, attempting to choke him (Cruz, 84-86; Ryan, 96-97; Gowkarran, 22-24)

91. Mr. Diaz was terminated the same day for his conduct by Mr. Ryan. Ms. Nagel and Ms. Cruz approved the termination. (Exhibit F, Bates D0084; Nagel, 34, 54; Cruz, 84-86; Ryan, 85, 93-94, 96-97; Gowkarran, 33)

## The Company Has No Record of Plaintiff Complaining of Discrimination

92. At no time did Mr. Matlick read any document in the suggestion box containing a complaint about Manny Diaz (Matlick, 77)

93. Ms. Cruz is not aware of any letter in the suggestion box related to Manny Diaz. (Cruz, 83)

94. Mr. Ryan has no record or recollection of receiving any communications through the Company suggestion box relative to Manny Diaz. (Ryan, 101)

95. Mr. Ryan has no record or recollection of Plaintiff complaining to him that Manny Diaz threatened him because of a letter in the Company suggestion box. (Ryan, 101)

96    Ms Nagel has no recollection or record that Plaintiff raised any complaints to her regarding Manny Diaz, despite that she was in the warehouse every day and spoke with him often. (Nagel, 50, 66-69)

97.    Ms. Cruz has no record or recollection of Plaintiff complaining to her or anyone else about Manny Diaz using the word "n-gger" or "gorilla" referring to Black employees. (Cruz, 109-110)

98.    Ms Cruz has no record or recollection of Plaintiff expressing concern that Manny Diaz said "Heil Hitler." (Cruz, 110)

99.    Mr. Ryan has no record or recollection of Plaintiff complaining to him that Mr. Diaz referred to Plaintiff as "n-gger" or "gorilla" and was never present if or when Mr. Diaz did so. (Ryan, 88)

100    Mr. Ryan stated that Mr. Diaz saluted him from time to time in a military manner, but that he has no record or recollection of Mr. Diaz saying "Heil Hitler" and giving a Nazi salute. (Ryan, 90-91)

101.    Jacques St. Juste did not complain about Mr. Diaz to any manager or owner at Two's Company. (St. Juste, 79-80)

102    St Juste was never present when Plaintiff alleges he spoke with Mr. Ryan and only knew what Plaintiff told him he said to Mr Ryan. (St Juste, 71)

### Co-Workers Knowledge of Alleged Racial Comments by Manny Diaz

103.    Edward Davis never heard Manny Diaz use the words "n-gger" or "gorilla." (Davis, 18)

104.    Edward Davis did not complain about Mr Diaz using the word "Taliban" to anyone at Two's Company. (Davis, 20, 27)

16

105    St. Juste swore in an affidavit that "we" told Gess Ryan that Manny Diaz called "us" "n-ggers" and "gorillas," and that Ryan did nothing about it, but then testified that he never complained about Diaz to Gess Ryan. (St Juste, 36, Exhibit H)

**Jacques St. Juste, Plaintiff's Friend, Co-Worker and Main Witness**

106.   Jacques St. Juste, Plaintiff's friend and co-worker and his main witness to allegations in his lawsuit, met with Ms Cruz just prior to leaving Two's Company and told her that because the company was moving to Elmsford and he was moving to Queens, the commute would be too much for him, so he was not going to move to Elmsford with the Company. (Cruz, 141)

107.   St. Juste was not asked to resign from Two's Company or fired. (St. Juste, 9, 87)

108.   St. Juste did not know who Ms. Sewnarine was talking to on the phone at work. (St. Juste, 88)

109    St. Juste discussed anything of importance to him related to work with Plaintiff (St. Juste, 81-82)

110    Plaintiff told St. Juste that he did not like the way he got fired and that he was mad that temporary employees worked on the tape machine after he was terminated. (St. Juste, 83)

111    Plaintiff did not tell St Juste that others were terminated at the same time and because St Juste no longer worked at Two's Company when Plaintiff was terminated on August 25, 2005, he had no idea who was terminated at that time. (St Juste, 84-85)

112.   The only thing that St. Juste knows Plaintiff told Gess Ryan is what Plaintiff told St Juste. (St Juste, 71)

113. Plaintiff testified that Mr. St. Juste wrote his entire Affidavit submitted in support of Plaintiff's EEOC Charge, with absolutely no help from him. (Pl Dep., 215; Exhibit H, St. Juste Affidavit produced by Plaintiff January 2, 2007)

114. St. Juste's Affidavit was written with Plaintiff's assistance and approval of its contents, Plaintiff typed it, corrected it and provided ideas for the Affidavit. (St. Juste, 59-60)

**Richard Gowkarran, Maintenance Man**

115. Richard ("Richie") Gowkarran has been a maintenance man with Two's Company for 8 ½ years. (Gowkarran, 15)

116. Mr. Gowkarran is from Guyana and has a third grade education. (Gowkarran, 7-8)

117. At some point during his employment, Mr. Gowkarran was cleaning the cafeteria and was aware that the company was going to discard a microwave oven. He asked whether a co-worker, Dean Richards, who is Black and Jamaican, wanted it. When Richards declined, Gowkarran asked, "Black people don't pick up things from the garbage?" Richards was offended and told Gowkarran he was "going to take me up." Gowkarran reported the incident to Gess Ryan, who told Gowkarran he was wrong and to go "beg his pardon" which Gowkarran did, ending the matter. (Gowkarran, 47-50; Richards, 29-32)

118. Mr. Gowkarran was involved in an altercation with Manny Diaz, for which Mr. Diaz was terminated. (See ¶¶90-91, supra)

119. St. Juste never heard Mr. Gowkarran say anything racially offensive. St. Juste did not hear Richard Gowkarran say that blacks eat from the garbage or complain about Mr. Gowkarran nor is he aware whether anyone else did. (St. Juste, 22-23, 26, 75)

120. Ms Nagel has no recollection that Plaintiff raised any concerns about Gowkarran. (Nagel, 118)

121. Ms Cruz received no complaints regarding Gowkarran. (Cruz, 107-108)

### PLAINTIFF'S ALLEGED DAMAGES

122. Plaintiff claims he is due compensatory damages for lost wages of $7,000.00 and otherwise refused to answer when asked how much money he was seeking for his lawsuit. (Exhibit I, Plaintiff's Rule 26(a)(1) Initial Disclosure Statement; Pl. Dep., 224)

123. Plaintiff did not look outside Mt. Vernon for a job. (Pl Dep., 208)

124. Plaintiff did not see a psychologist, counselor, psychiatrist or any other health care provider regarding his alleged emotional distress, claiming he could not afford the co-payment. (Pl. Dep., 205-206)

125. Plaintiff's current position has a higher rate of pay than that he was earning at Two's Company. (Pl. Dep., 211-212)

    Respectfully submitted,

    JACKSON LEWIS LLP
    59 Maiden Lane, 39th Floor
    New York, New York 10038-4502
    (212) 545-4000

    By: _____
    Marjorie Kaye, Jr. (MK 7141)
    Jason A. Zoldessy (JZ 6522)
    ATTORNEYS FOR DEFENDANTS

Dated: April 30, 2007
    New York, New York